## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SANDRA MCCARTER , <br><br> Plaintiff, <br><br> v. <br><br> SYNGENTA AG, SYNGENTA CROP PROTECTION, LLC, CHEVRON U.S.A., INC., and DOES 1 through 60 <br><br> Defendants. | Civil Action No. <u>3:24-pq-1741</u> <br><br> **Related to MDL No. 3004 COMPLAINT** <br><br> **FOR DAMAGES** <br><br> **JURY TRIAL DEMANDED** |

COMES NOW Plaintiff Sandra McCarter, by and through counsel, complaining of Defendants Syngenta AG ("SAG") and Syngenta Crop Protection, LLC, ("SCPLLC") (together with their predecessors-in-interest and sometimes referred to collectively as the "Syngenta Defendants") and Chevron U.S.A., Inc. (together with its predecessors-in-interest and sometimes referred to collectively as the "Chevron Defendants"); and Does One through Sixty, and allege against said Defendants the following:

### STATEMENT OF THE CASE

1.     Plaintiff Sandra McCarter was exposed to paraquat while working as a crop laborer on Sanna Carlucci Ranch in Palos, California, and living in agricultural areas from about 1981 to about 2021.

2.     Plaintiff Sandra McCarter suffers from neurological injuries consistent with Parkinson's disease caused by her exposure to paraquat.

3.     Defendants are companies that, starting in or around 1964, have designed, manufactured, distributed, licensed, marketed, and sold paraquat for use in the United States,

including California.

4.      Plaintiff brings this action to recover damages for personal injuries and damages resulting from exposures to paraquat manufactured, distributed, and sold by Defendants.

5.      Defendants' tortious conduct, including their negligent acts and omissions in the research, testing, design, manufacture, marketing, and sale of paraquat, caused Plaintiff's injuries and damages. At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that paraquat was a highly toxic substance that can cause severe neurological injuries and impairment, and should have taken steps in their research, manufacture, and sale of paraquat to ensure that people would not be harmed by foreseeable uses of paraquat.

## PARTIES

**<u>Plaintiff</u>**

6.      Plaintiff Sandra McCarter is a citizen and resident of the State of California.

7.      Plaintiff Sandra McCarter suffers from neurological injuries consistent with Parkinson's disease ("PD") caused by her exposure to paraquat within the State of California generally, and Counties within the U.S. District Court for the Eastern District of California specifically.

8.      Plaintiff brings this action against Defendants to recover all damages for personal injuries and other economic damages resulting from exposure to paraquat over many years in California, including Counties within the U.S. District Court for the Eastern District of California.

9.      Plaintiff brings this action to recover her damages as a result of Defendants' tortious conduct, including severe and permanent physical injuries and past and future pain,

suffering, mental anguish, inconvenience, physical impairment, medical and life care expenses, disfigurement, loss of function, impaired enjoyment of life, susceptibility to future harm or injury, shortened life expectancy, lost wages, and loss of earning capacity.

**Defendants and their corporate predecessors**

10.     Defendants are companies and successors-in-interest to companies that manufactured, distributed, and sold paraquat for use in California, acted in concert with others who manufactured, distributed, and sold paraquat for use in California, sold and used paraquat in California , or owned property in California where paraquat was used.

### a.   Syngenta Defendants

11.     Defendant Syngenta Crop Protection LLC ("SCPLLC") is a Delaware company with its principal place of business in Greensboro, North Carolina. SCPLLC is a wholly owned subsidiary of Defendant Syngenta AG.

12.     Defendant Syngenta AG ("SAG") is a foreign corporation with its principal place of business in Basel, Switzerland.

13.     In 1926, four British chemical companies merged to create the British company that then was known as Imperial Chemical Industries Ltd. and ultimately was known as Imperial Chemical Industries PLC ("ICI").

14.     In or about 1971, ICI created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which at various times was known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc., and ultimately was known as ICI Americas Inc. (collectively, "ICI Americas").

15.     In or about 1992, ICI merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, including the agrochemicals business it had operated at one time through

3

a wholly owned British subsidiary known as Plant Protection Ltd. and later as a division within ICI, into a wholly owned British subsidiary known as ICI Bioscience Ltd.

16.     In 1993, ICI demerged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with the British company Zeneca Group PLC as its ultimate parent company.

17.     As a result of ICI's demerger and creation of the Zeneca Group, ICI Bioscience Ltd. was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of Zeneca Group PLC.

18.     Before ICI's demerger and creation of the Zeneca Group, ICI had a Central Toxicology Laboratory that performed and hired others to perform health and safety studies that were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental Protection Agency ("EPA") to secure and maintain the registration of paraquat and other pesticides for use in the United States.

19.     As a result of ICI's demerger and creation of the Zeneca Group, ICI's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory.

20.     After ICI's demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory continued to perform and hire others to perform health and safety studies that were submitted to EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

21.     As a result of ICI's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of

Zeneca Group PLC organized under the laws of the State of Delaware.

22. In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company.

23. As a result of the merger that created the Novartis Group, Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd., organized under the laws of the State of New York, was merged into or continued its business under the same or similar ownership and management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.

24. In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zeneca were wholly owned subsidiaries.

25. In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create the Syngenta Group, a global group of companies focused solely on agribusiness, with Defendant Syngenta AG ("SAG") as the ultimate parent company.

26. As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of SAG.

27. As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central Toxicology Laboratory.

28.     Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire others to perform health and safety studies for submission to the EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

29.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their business under the same or similar ownership and management, as Syngenta Crop Protection, Inc. ("SCPI"), a wholly owned subsidiary of SAG organized under the laws of the State of Delaware.

30.     In 2010, SCPI was converted into Defendant Syngenta Crop Protection LLC ("SCPLLC"), a wholly owned subsidiary of SAG organized and existing under the laws of the State of Delaware with its principal place of business in Greensboro, North Carolina.

31.     SAG is a successor by merger or continuation of business to its corporate predecessor Novartis AG.

32.     SAG is a successor by merger or continuation of business to its corporate predecessor AstraZeneca PLC.

33.     SAG is a successor by merger or continuation of business to its corporate predecessor Zeneca Group PLC.

34.     SAG is a successor by merger or continuation of business to its corporate predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.

35.     SAG is a successor by merger or continuation of business to its corporate predecessor ICI Bioscience Ltd.

36.     SAG is a successor by merger or continuation of business to its corporate predecessor Plant Protection Ltd.

37.     SCPLLC is a successor by merger or continuation of business to its corporate predecessor SCPI.

38.     SCPLLC is a successor by merger or continuation of business to its corporate predecessor NCPI.

39.     SCPLLC is a successor by merger or continuation of business to its corporate predecessor Ciba-Geigy Corporation.

40.     SCPLLC is a successor by merger or continuation of business to its corporate predecessor Zeneca Inc.

41.     SCPLLC is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc.

42.     SCPLLC is registered to do business in the State of California.

43.     SCPLLC has done and does substantial business in the State of California, including Counties within the U.S. District Court for the Eastern District of California, including the following:

a.     markets, advertises, distributes, sells, and delivers paraquat and other pesticides to distributors, dealers, applicators, and farmers in the State of California, including Counties within the U.S. District Court for the Eastern District of California.

b.     secures and maintains the registration of paraquat and other pesticides with the EPA and the California Department of Agriculture to enable itself and others to manufacture, distribute, sell, and use these products in the State of California, including

Counties within the U.S. District Court for the Eastern District of California; and

c.      performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of pesticides in the State of California, including Counties within the U.S. District Court for the Eastern District of California.

44.      SAG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland.

45.      SAG is a holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SCPLLC.

46.      SAG is a management holding company.

47.      Syngenta Crop Protection AG ("SCPAG"), a Swiss corporation with its principal place of business in Basel, Switzerland, is one of SAG's direct, wholly owned subsidiaries.

48.      SCPAG employs the global operational managers of production, distribution and marketing for the Syngenta Group's Crop Protection ("CP") and Seeds Divisions.

49.      The Syngenta Group's CP and Seeds Divisions are the business units through which SAG manages its CP and Seeds product lines.

50.      The Syngenta Group's CP and Seeds Divisions are not and have never been corporations or other legal entities.

51.      SCPAG directly and wholly owns Syngenta International AG ("SIAG").

52.      SIAG is the "nerve center" through which SAG manages the entire Syngenta Group.

53.      SIAG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.

54.      SIAG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations,

Research and Development, Legal and Taxes, and Finance.

55.    Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

56.    SAG is the indirect parent of SCPLLC through multiple layers of corporate ownership:

a.    SAG directly and wholly owns Syngenta Participations AG;

b.    Syngenta Participations AG directly and wholly owns Seeds JV C.V.;

c.    Seeds JV C.V. directly and wholly owns Syngenta Corporation;

d.    Syngenta Corporation directly and wholly owns Syngenta Seeds, LLC;

e.    Syngenta Seeds, LLC directly and wholly owns SCPLLC.

57.    Before SCPI was converted to SCPLLC, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of directors.

58.    SCPI's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

59.    SAG has purposefully organized the Syngenta Group, including SCPLLC, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.

60.    Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SAG in fact exercises an unusually high degree of control over its country-specific business units, including SCPLLC, through a "matrix management'' system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

61.     The lines of authority and control within the Syngenta Group do not follow its formal legal structure, but instead follow this global "functional" management structure.

62.     SAG controls the actions of its far-flung subsidiaries, including SCPLLC, through this global "functional" management structure.

63.     SAG's board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SPLLC.

64.     The SEC consists of the CEO and various global Heads, which currently are:

    a.     The Chief Executive Officer;

    b.     Group General Counsel;

    c.     The President of Global Crop Protection;

    d.     The Chief Financial Officer;

    e.     The President of Global Seeds; and

    f.      The Head of Human Resources.

65.     SIAG employs all of the members of the Executive Committee.

66.     Global Syngenta Group corporate policies require SAG subsidiaries, including SPLLC, to operate under the direction and control of the SEC and other unincorporated global management teams.

67.     SAG's board of directors meets five to six times a year.

68.     By contrast, SCPI's board of directors rarely met, either in person or by telephone, and met only a handful of times over the last decade before SCPI became SCPLLC.

69.     Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from

the SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI board members.

70.     Since SCPI became SCPLLC, decisions that are nominally made by the board or managers of SCPLLC in fact continue to be directed by the SEC or other Syngenta Group global or regional managers.

71.      Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the direction of the SEC or other Syngenta Group global or regional managers.

72.     Since SCPI became SCPLLC, the appointment and removal of the manager(s) of SCPLLC continues to be directed by the SEC or other Syngenta Group global or regional managers.

73.     The management structure of the Syngenta Group's CP Division, of which SCPLLC is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries.

74.     Atop the CP Division is the CP Leadership Team (or another body with a different name but substantially the same composition and functions), which includes the President of Global Crop Protection, the CP region Heads (including SCPLLC President Vern Hawkins), and various global corporate function Heads.

75.     The CP Leadership Team meets bi-monthly to develop strategies for new products, markets, and operational efficiencies and to monitor performance of the Syngenta Group's worldwide CP business.

76.     Under the CP Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but

substantially the same composition and functions), which oversees the Syngenta Group's U.S. and Canadian CP business (and when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican CP business).

77.     The North America Regional Leadership Team is chaired by SCPLLC's president and includes employees of SCPLLC and the Syngenta Group's Canadian CP company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company).

78.     The Syngenta Group's U.S. and Canadian CP companies, including SCPLLC, report to the North America Regional Leadership Team, which reports to the CP Leadership Team, which reports to the SEC, which reports to SAG's board of directors.

79.     Some members of the North America Regional Leadership Team, including some SCPLLC employees, report or have in the past reported not to their nominal superiors within the companies that employ them, but directly to the Syngenta Group's global Heads.

80.     Syngenta Group global Heads that supervise SCPLLC employees participate and have in the past participated in the performance reviews of these employees and in setting their compensation.

81.     The Syngenta Group's functional reporting lines have resulted in employees of companies, including SCPLLC, reporting to officers of remote parent companies, officers of affiliates with no corporate relationship other than through SAG, or officers of subsidiary companies.

82.     SCPLLC performs its functions according to its role in the CP Division structure:

a.     CP Division development projects are proposed at the global level, ranked and funded at the global level after input from functional entities such as the CP

Leadership Team and the North America Regional Leadership Team, and given final approval by the SEC;

b.      New CP products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions for the entire CP Division;

c.      These products are then tested by other Syngenta Group companies, including SCPLLC, under the direction and supervision of the SEC, the CP Leadership Team, or other Syngenta Group global managers;

d.      Syngenta Group companies, including SCPLLC, do not contract with or compensate each other for this testing;

e.      Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

f.      If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the target market is global or regional), not individual Syngenta Group companies such as SCPLLC, decide whether to sell the product;

g.      Decisions to sell the product must be approved by the SEC; and

h.      The products that are sold all bear the same Syngenta trademark and logo.

83.     SCPLLC is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SAG and applicable to all Syngenta Group companies.

84.     These "reserved powers" require Syngenta Group companies to seek approval

for certain decisions from higher levels within the Syngenta Group's functional reporting structure.

85. For example, although SAG permits Syngenta Group companies to handle small legal matters on their own, under the "reserved powers" system, SAG's Board of Directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including SCPLLC, if their value exceeds an amount specified in the "reserved powers."

86. Similarly, the appointments of senior managers at SCPLLC must be approved by higher levels than SCPLLC's own management, board of directors, or even its direct legal owner.

87. Although SCPLLC takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

88. Although SAG subsidiaries, including SCPLLC, pay lip service to legal formalities that give the appearance of authority to act independently, in practice many of their acts are directed or pre-approved by the Syngenta Group's global management.

89. SAG and the global management of the Syngenta Group restrict the authority of SCPLLC to act independently in areas including:

a. Product development;

b. Product testing (among other things, SAG and the global management of the Syngenta Group require SCPLLC to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or oversee product safety testing that SCPLLC submits to the EPA in support of the registrations of paraquat and other pesticides);

c. Production;

d.      Marketing;

e.      Sales;

f.      Human resources;

g.      Communications and public affairs;

h.      Corporate structure and ownership;

i.      Asset sales and acquisitions;

j.      Key appointments to boards, committees and management positions;

k.      Compensation packages;

l.      Training for high-level positions; and

m.      Finance (including day-to-day cash management) and tax.

90.     Under the Syngenta Group's functional management system, global managers initiate and the global Head of Human Resources oversees international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.

91.     Under this international assignment program, at the instance of Syngenta Group global managers, SCPLLC officers and employees have been "seconded" to work at other SAG subsidiaries, and officers and employees of other Syngenta Group subsidiaries have been "seconded" to work at SCPLLC.

92.     The Syngenta Group's functional management system includes a central global finance function—known as Syngenta Group Treasury—for the entire Syngenta Group.

93.     The finances of all Syngenta Group companies are governed by a global treasury

policy that subordinates the financial interests of SAG's subsidiaries, including SCPLLC, to the interests of the Syngenta Group as a whole.

94.     Under the Syngenta Group's global treasury policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries such as SCPLLC, holds the cash on account, and lends it to other subsidiaries that need liquidity.

95.     The Syngenta Group's global treasury policy does not allow SAG subsidiaries such as SCPLLC to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.

96.     Syngenta Group Treasury also decides whether SCPLLC will issue a dividend or distribution to its direct parent company, and how much that dividend will be.

97.     SCPLLC's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

98.     In 2011, the United States District Court for the Southern District of Illinois held that SAG's unusually high degree of control over SCPLLC made SCPLLC the agent or alter ego of SAG and therefore subjected SAG to jurisdiction based on the contacts of SCPLLC. *See City of Greenville, Ill. v. Syngenta Crop Protection, Inc.*, 830 F. Supp. 2d 550 (S.D. Ill. 2011).

99.     SAG continues to exercise the unusually high degree of control over SCPLLC that led the District Court to find in 2011 that SAG was subject to jurisdiction based on the contacts of SCPLLC.

100.     SAG, through its agent or alter ego, SCPLLC, does substantial business in the State of California, including Counites within the Eastern District of California, in the ways previously alleged as to SCPLLC.

### b.  Chevron Defendants

101.    Defendant Chevron U.S.A., Inc. ("Chevron U.S.A.") is a Pennsylvania corporation with its principal place of business in San Ramon, California.

102.    Chevron Chemical Company ("Chevron Chemical") was a corporation organized in 1928 under the laws of the State of Delaware.

103.    In 1997, Chevron Chemical was merged into Chevron Chemical Company LLC ("Chevron Chemical LLC"), a limited liability company organized under the laws of the State of Delaware.

104.    In the 2000s, Chevron Chemical LLC was merged into or continued to operate under the same or similar ownership and management as Defendant Chevron Phillips Chemical Company LP ("CP Chemical"), a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business in The Woodlands, Texas.

105.    At least until 1986, Chevron Chemical Company was engaged in design, registration, manufacture, formulation, testing, packaging, labeling, distribution, and/or sale of paraquat products in the United States.

106.    In or about the year 2000, Chevron USA, Inc. expressly assumed the liabilities of Chevron Chemical and Chevron Chemical LLC arising from Chevron Chemical Company's then-discontinued agrichemical business, which included the design, registration, manufacture, formulation, packaging, labeling, distribution, marketing, and sale of paraquat products in the United States as alleged in this Complaint.

107.    In this litigation, Chevron U.S.A. Inc. has stipulated as follows: "Defendant, through counsel who has appeared in this proceeding, has represented to Plaintiffs, and hereby represents to the Court, that during the year 2000, Chevron U.S.A. Inc. expressly assumed all liabilities of Chevron Chemical Company LP and Chevron Chemical Company arising from

their paraquat business activities, including alleged activities of design, registration, manufacture, formulation, testing, packaging, labeling, distribution, and/or sale of paraquat products in the United States." (ECF No. 478 in Case No. 3:21-md-03004-NJR).

108.    Defendant Chevron U.S.A. Inc. has also stipulated as follows "Chevron U.S.A. Inc. further represented to Plaintiffs, and hereby represents to the Court, that Chevron Phillips Chemical Company LP and Chevron Phillips Chemical Company LLC (collectively "CP Chem"), Phillips 66, Phillips 66 Company (collectively "Phillips 66"), and Chevron Corporation hold no liability for the above-listed activities with respect to paraquat; rather, Chevron U.S.A. Inc. is the proper party relating to allegations involving the above-listed activities with respect to paraquat."  (ECF No. 478 in Case No. 3:21-md-03004-NJR).

### C.   Doe Defendants

109.    The true names or capacities whether individual, corporate, governmental, or associate, of the defendants named herein as Doe are unknown to Plaintiff who therefore sue said defendants by such fictitious names. Plaintiff prays leave to amend this Complaint to show their true names and capacities and/or basis for liability when the same have been finally determined.

110.    Plaintiff is informed and believes, and upon such information and belief, alleges that each of the defendants designated h e r e i n as Doe is strictly, negligently, or otherwise legally  responsible in some manner for the events and happenings herein referred to, and negligently or otherwise caused injury and damages proximately thereby to Plaintiff as is hereinafter alleged.

111.    At all times h e r e i n mentioned each and every of the Defendants was the agent, servant, employee, joint venture, alter ego, successor-in-interest, and predecessor-interest

of each  of the other, and each was acting within the court and scope of this agency, service, joint venture,  alter ego relationship, employment, and corporate interrelationship.

## VENUE AND JURISDICTION

112.     Subject matter jurisdiction over this action exists pursuant to 28 U.S.C. § 1332 because the amount in controversy between Plaintiff and Defendants exceeds $75,000.00, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and each Defendant. Plaintiff is a resident and citizen of California, and Defendants, except for Chevron U.S.A. Inc, are all citizens of states other than California. The corporate Defendant corporation, except for Chevron U.S.A. Inc, are all incorporated and have their principal place of business outside of the State of California. SAG is a foreign corporation with its principal place of business in Basel, Switzerland; and Chevron U.S.A. Inc. is a Pennsylvania corporation with its principal place of business in San Ramon in Contra Costa County, California. SPLLC is a Delaware limited liability company and its sole member is Syngenta Corporation, a Delaware corporation with its principal place of business in Delaware.

113.     This action is being filed directly in the Southern District of Illinois pursuant to Case Management Order 1 of MDL 3004 as this case would be subject to transfer to MDL 3004.

114.     But for CMO 1, venue is proper in the U.S. District Court for the Eastern District of California pursuant to 28 U.S.C. § 1391 because Defendants conduct business and are subject to personal jurisdiction in the U.S. District Court for the Eastern District of California. Defendants sold, marketed, and/or distributed paraquat within the U.S. District Court for the Eastern District of California. And, a substantial part of the acts and/or omissions giving rise to these claims occurred within the U.S. District Court for the Eastern District of California.

115.     The United States District Court for the Eastern District of California has

personal jurisdiction over each of the Defendants in this diversity case because a state court of California would have such jurisdiction, in that:

a.      Over a period of two (Chevron Defendants) to six (Syngenta Defendants) decades, each Defendant and/or its predecessor(s), together with those with whom they were acting in concert, manufactured paraquat for use as an active ingredient in paraquat products, distributed paraquat to formulators of paraquat products, formulated paraquat products, marketed paraquat products to agricultural community in the State of California generally, and Counties within the Eastern District of California specifically, and/or distributed paraquat products, intending that such products would be regularly, and knowing they regularly were, sold and used in the State of U.S. District Court for the Eastern District of California generally, and Counties within the U.S. District Court for the Eastern District of California specifically;

b.      Plaintiff's claims against each Defendant arise out of these contacts between the Defendant and/or its predecessor(s), together with those with whom they were acting in  concert, with the State of U.S. District Court for the Eastern District of California Counties within the U.S. District Court for the Eastern District of California specifically.

c.      These contacts between each Defendant and/or its predecessors, together with those with whom they were acting in concert, and the State of California generally, and Counties within the U.S. District Court for the Eastern District of California specifically, were so regular, frequent, and sustained as to provide fair warning that it might be hauled into court there, such that requiring it to defend this

action in the U.S. District Court for the Eastern District of California does not offend traditional notions of fair play and substantial justice; and

d.       Plaintiff's claims against each Defendant arise out of exposure in the U.S. District Court for the Eastern District of California to paraquat that each Defendant marketed, licensed, advertised, distributed, sold, and delivered to chemical companies, licensees, distributors, and dealers whom each Defendant expected to distribute and sell in or for use in the State of California generally, and Counties within the U.S. District Court for the Eastern District of California specifically.

## GENERAL FACTUAL ALLEGATIONS

**Paraquat manufacture, distribution, and sale**

116.    ICI, a legacy company of Syngenta, claims to have discovered the herbicidal properties of paraquat in 1955.

117.    The leading manufacturer of paraquat is Syngenta, which (as ICI) developed the active ingredient in paraquat in the early 1960s.

118.    ICI produced the first commercial paraquat formulation and registered it in England in 1962.

119.    Paraquat was marketed in 1962 under the brand name Gramoxone.

120.    Paraquat first became commercially available for use in the United States in 1964.

121.    In or about 1964, ICI and Chevron Chemical entered into agreements regarding the licensing and distribution of paraquat ("the ICI-Chevron Chemical Agreements").

122.    In or about 1971, ICI Americas became a party to the ICI-Chevron Chemical Agreements on the same terms as ICI.

123.    The ICI-Chevron Chemical Agreements were renewed or otherwise remained in effect until about 1986.

124.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical a license to their patents and technical information to permit Chevron Chemical to formulate or have formulated, use, and sell paraquat in the United States and to grant sub-licenses to others to do so.

125.    In the ICI-Chevron Chemical Agreements, Chevron Chemical granted ICI and ICI Americas a license to its patents and technical information to permit ICI and ICI Americas to formulate or have formulated, use, and sell paraquat throughout the world and to grant sub-licenses to others to do so.

126.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas and Chevron Chemical agreed to exchange patent and technical information regarding paraquat.

127.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical exclusive rights to distribute and sell paraquat in the United States.

128.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical a license to distribute and sell paraquat in the U.S. under the ICI-trademarked brand name Gramoxone and other names.

129.    ICI and ICI Americas and Chevron Chemical entered into the ICI-Chevron Chemical Agreements to divide the worldwide market for paraquat between them.

130.    Under the ICI-Chevron Chemical Agreements, Chevron Chemical distributed and sold paraquat in the U.S. and ICI and ICI Americas distributed and sold paraquat outside the United States.

131.    Under the ICI-Chevron Chemical Agreements and related agreements, both ICI

and ICI Americas and Chevron Chemical distributed and sold paraquat under the ICI-trademarked brand names Gramoxone, Ortho Paraquat, and other names.

132.    Under the ICI-Chevron Chemical Agreements, ICI and ICI Americas and Chevron Chemical exchanged patent and technical information regarding paraquat.

133.    Under the ICI-Chevron Chemical Agreements, ICI and ICI Americas provided to Chevron Chemical health and safety and efficacy studies performed or procured by ICI's Central Toxicology Laboratory, which Chevron Chemical then submitted to the USDA and the EPA to secure and maintain the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United States.

134.    Under the ICI-Chevron Chemical Agreements and related agreements, ICI and ICI Americas manufactured and sold paraquat to Chevron Chemical that Chevron Chemical then distributed and sold in the United States, including in California, where Chevron Chemical registered paraquat products with the California Department of Agriculture and marketed, advertised, and promoted them to California distributors, dealers, applicators, and farmers.

135.    Under the ICI-Chevron Chemical Agreements and related agreements, Chevron Chemical distributed and sold paraquat in the United States under the ICI-trademarked brand names Gramoxone and Ortho Paraquat, and other names, including in California, where Chevron Chemical registered such products with the California Department of Agriculture to enable them to be lawfully distributed, sold, and used in California and marketed, advertised, and promoted them to California distributors, dealers, applicators, and farmers.

136.    SAG and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1964 through the present, and at all relevant times intended or expected their paraquat

products to be distributed and sold in California , where they registered such products with the California Department of Agriculture to enable them to be lawfully distributed, sold, and used in California, and marketed, advertised, and promoted them to California distributors, dealers, applicators, and farmers.

137.    SAG and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the USDA and the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United States from about 1964 through the present.

138.    SCPLLC and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1971 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in California, where they registered such products with the California Department of Agriculture to enable them to be lawfully distributed, sold, and used in California , and marketed, advertised, and promoted them to California distributors, dealers, applicators, and farmers.

139.    SCPLLC and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the U.S. from about 1971 through the present.

140.    Chevron Chemical manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1964 through at least 1986, acting in concert with ICI and ICI Americas throughout this period, including in California, where Chevron Chemical registered such products with the California Department of Agriculture to enable them to be

lawfully distributed, sold, and used in California , and marketed, advertised, and promoted them to California distributors, dealers, applicators, and farmers.

**Paraquat use**

141.   Since 1964, paraquat has been used in the U.S. to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest.

142.   At all relevant times, where paraquat was used, it was commonly used multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year, and such use was as intended or directed or reasonably foreseeable.

143.   At all relevant times, paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert was typically sold to end-users in the form of liquid concentrates (and less commonly in the form of granular solids) designed to be diluted with water before or after loading it into the tank of a sprayer and applied by spraying it onto target weeds.

144.   At all relevant times, concentrates containing paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated with one or more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which as typically formulated contains a surfactant) before use.

145.   At all relevant times, paraquat typically was applied with a knapsack sprayer,

handheld sprayer, aircraft (i.e., crop duster), truck with attached pressurized tank, or tractor-drawn pressurized tank, and such use was as intended or directed or was reasonably foreseeable.

**Paraquat exposure**

146.    At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks.

147.    At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, persons who sprayed paraquat or were in or near areas where it was being or recently had been sprayed would be exposed to paraquat, including as a result of spray drift, the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind, and as a result of contact with sprayed plants.

148.    At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines or valves were being cleared.

149.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present.

150.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurred.

151.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

152.    At all relevant times, it was reasonably foreseeable that paraquat that entered the human body via ingestion into the digestive tract could enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract).

153.    At all relevant times, it was reasonably foreseeable that paraquat that entered the human body, whether via absorption, respiration, or ingestion, could enter the bloodstream.

154.    At all relevant times, it was reasonably foreseeable that paraquat that entered the bloodstream could enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier.

155.    At all relevant times, it was reasonably foreseeable that paraquat that entered the nose and nasal passages could enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier.

**Parkinson's disease**

156.    Parkinson's disease ("PD") is a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

157.    Scientists who study PD generally agree that PD can be caused by environmental exposures.

### a.    Symptoms and treatment

158.    The characteristic symptoms of PD are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

159.    PD's primary motor symptoms often result in "secondary'' motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

160.    Non-motor symptoms - such as loss of or altered sense of smell, constipation, low blood pressure on rising to stand, sleep disturbances, and depression - are present in most cases of PD, often for years before any of the primary motor symptoms appear.

161.    There is currently no cure for PD. No treatment will slow, stop, or reverse its progression, and the treatments most-commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

### b.    Pathophysiology

162.    The selective degeneration and death of dopaminergic neurons (dopamineproducing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of PD.

163.    Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function, among other things.

28

164.   The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

165.   Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of PD.

166.   The presence of Lewy bodies (insoluble aggregates of a protein called alphasynuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of PD.

167.   Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

168.   Scientists who study PD generally agree that oxidative stress is a major factor in —if not the precipitating cause of — the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of PD.

### c.   Paraquat's toxicity

169.   Paraquat is highly toxic to both plants and animals.

170.   Paraquat injures and kills plants by creating oxidative stress that causes or contributes to cause the degeneration and death of plant cells.

171.   Paraquat injures and kills humans and other animals by creating oxidative stress that causes or contributes to cause the degeneration and death of human/animal cells.

172.   Paraquat creates oxidative stress in the cells of plants and humans/animals because of "redox properties" that are inherent in its chemical composition and structure: it is a

strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

173.    The redox cycling of paraquat in living cells interferes with cellular functions that are necessary to sustain life — photosynthesis in the case of plant cells and cellular respiration in the case of animal cells.

174.    The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids—molecules that are essential components of the structures and functions of living cells.

175.    Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical.

176.    Paraquat's redox properties have been known since at least the 1930s.

177.    That paraquat is toxic to the cells of plants and humans/animals because it creates oxidative stress through redox cycling has been known since at least the 1960s.

178.    The surfactants with which the concentrates containing paraquat manufactured, distributed, and sold by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated were likely to increase paraquat's toxicity to humans by increasing its ability to stay in contact with or penetrate the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, the lungs, and the gastrointestinal tract.

**Paraquat and Parkinson's disease**

30

179.    The same redox properties that make paraquat toxic to plant cells and other types of human/animal cells make it toxic to dopaminergic neurons — paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons by creating oxidative stress through redox cycling.

180.    Although PD is not known to occur naturally in any species other than humans, PD research is often performed using "animal models," in which scientists artificially produce in laboratory animal conditions that show features of PD. Paraquat is one of only a handful of toxins that scientists use to produce animal models of PD.

181.    In animal models of PD, hundreds of studies involving various routes of exposure have found that paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human PD, and motor deficits and behavioral changes consistent with those commonly seen in human PD.

182.    Hundreds of in vitro studies have found that paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells).

183.    Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between paraquat exposure and PD, including multiple studies finding a two-fold to five-fold or greater increase in the risk of PD in populations with occupational exposure to paraquat compared to populations without such exposure.

**Plaintiff's exposure and injury**

184.    From about 1981 to about 2021, Plaintiff Sandra McCarter was repeatedly exposed to and inhaled, ingested, or absorbed paraquat when she lived and worked as a crop

laborer on Sanna Carlucci Ranch in Palos, California. Ms. McCarter would get the chemical mist from the crop dusters directly on her skin when they sprayed the fields in Merced County, California.

185.    From about 1981 to about 2021, the farm where Plaintiff worked, and the area she lived in Merced County was sprayed to control weeds at least four times a year.

186.    From about 1981 to about 2021, Plaintiff was nearby as Paraquat was sprayed, as part of her work on Sanna Carlucci Ranch, and daily life in Merced County, California.

187.    From about 1981 to about 2021, Plaintiff frequently was nearby as Paraquat was mixed, as part of her work on Sanna Carlucci Ranch in Merced County, California.

188.    From about 1981 to about 2021, Plaintiff would frequently be in the field immediately after paraquat was sprayed as part of her work on Sanna Carlucci Ranch in Merced County, California.

189.    Plaintiff Sandra McCarter was exposed to paraquat when it was mixed, loaded, applied, sprayed and/or cleaned; as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind); and/or as a result of contact with sprayed plants.

190.    On information and belief, during the time Plaintiff was exposed to paraquat, Defendants manufactured and sold the paraquat that the owners or operators of farms applied or had applied on farms in Counties within the U.S. District Court for the Eastern District of California, including Merced County.

191.    On information and belief, Defendants manufactured and sold the paraquat to which Plaintiff was exposed.

192.    Defendants knew or should have known of the risk of neurological injuries to

persons who used paraquat, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed and fraudulently concealed said risk.

193.     As a result of repeated and consistent paraquat exposure, Plaintiff Sandra McCarter was diagnosed with Parkinson's disease.

194.     The paraquat to which Plaintiff Sandra McCarter was exposed was sold and used in California, and was manufactured, distributed, and on information and belief sold by one or more of the Defendants and their corporate predecessors and others with whom they acted in concert intending or expecting that it would be sold and used in California. Paraquat manufactured, distributed, and sold at different times as to each Defendant, its corporate predecessors, and others with whom they acted in concert, and not necessarily throughout the entire period of her exposure as to any particular Defendant, its corporate predecessors, and others with whom they acted in concert.

195.     On information and belief, Plaintiff was exposed to paraquat that was sold and used in California, and was manufactured, distributed, and sold by SCPLLC, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending or expecting that it would be sold and used in California.

196.     On information and belief, Plaintiff was exposed to paraquat that was sold and used in California and was manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending or expecting that it would be sold and used in California.

197.     On information and belief, Plaintiff was exposed to paraquat that was sold and used in California, and was manufactured, distributed, and sold by Chevron Chemical, acting in

concert with ICI and ICI Americas, intending or expecting that it would be sold and used in California.

198.    Plaintiff Sandra McCarter first became aware of paraquat's role in causing her neurological injuries less than two years before the filing of this complaint, after seeing an ad linking paraquat to Parkinson's disease in 2022.

199.    Plaintiff did not discover this earlier because she had no reason to suspect that her working with paraquat had caused or could cause her to suffer such neurological injuries.

200.    Before becoming aware of Paraquat's role in causing such neurological injuries less than two years before the filing of this complaint, Plaintiff had no reason to believe her neurological injuries had been caused by wrongdoing.

201.    Before Plaintiff became aware of Paraquat's role in causing such neurological injuries less than two years before the filing of this complaint, no doctor or any other person told Plaintiff that her injuries were or could have been caused by exposure to Paraquat.

202.    Before Plaintiff became aware of paraquat's role in causing such neurological injuries less than two years before the filing of this complaint, Plaintiff had never read or heard of any articles in newspapers, scientific journals, or other publications that associated such neurological injuries or Parkinson's disease with paraquat.

203.    Before Plaintiff became aware of paraquat's role in causing such neurological injuries less than two years before the filing of this complaint, Plaintiff had never read or heard of any lawsuit alleging that paraquat causes such neurological injuries or Parkinson's disease.

204.    Plaintiff reasonably relied on Defendants to disclose known material health risks and to provide adequate instructions to avoid known material health risks posed by using paraquat as it was intended and expected to be used by Defendants.

205.    At all times material herein, Defendants knew that paraquat was a highly toxic substance that can cause severe neurological injuries and impairment.  As set forth above in this complaint, Defendants knew that the paraquat to which Plaintiff was exposed, when inhaled, ingested, or absorbed into the bodies of persons who used it as expected by the Defendants, who were nearby while it was being used as expected by Defendants, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed as expected by Defendants, was likely to cause, potentiate, promote, or contribute to cause latent neurological damage that was both permanent and cumulative, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

206.    Despite having such actual knowledge, Defendants provided misleading and inadequate instructions; deliberately crafted their label, marketing, and promotion to mislead farmers, property managers and consumers; and engaged in and disseminated selective fraudulent research, testing, and advertising, all in an effort to turn a profit by fraudulently convincing intended and foreseeable users such as Plaintiff, that paraquat did not cause significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

207.    As a result of Defendants' misrepresentations and concealment, at no time when Plaintiff was using paraquat was she aware that exposure to paraquat could cause any latent injury, including any latent neurological injury or Parkinson's disease, or that any precautions were necessary to prevent any latent injury that could be caused by exposure to paraquat.

208.    Additionally, as a result of Defendants' misrepresentations and concealment, Plaintiffs did not become aware of paraquat's role in causing Plaintiff's neurological injuries

35

consistent with Parkinson's disease until 2022.

209.    Defendants are estopped from asserting any statute of limitations or statute of repose because, as described above in this complaint, Defendants took affirmative steps—before, during and after Plaintiff's exposures—to fraudulently conceal that the paraquat to which Plaintiff was exposed, when inhaled, ingested, or absorbed into the bodies of persons who used it as expected by the Defendants, who were nearby while it was being used as expected by Defendants, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed as expected by Defendants, was likely to cause, potentiate, promote, or contribute to cause latent neurological damage that was both permanent and cumulative, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

210.    Defendants made such misrepresentations with the intent to deceive Plaintiff; and Plaintiff relied on this intentional concealment to her detriment, as the concealment prevented Plaintiff from learning about the cause of action through the exercise of ordinary diligence.

**<u>Plaintiff's Damages</u>**

211.    Defendants' tortious conduct caused Plaintiff Sandra McCarter to suffer severe and permanent physical injuries, pain, mental anguish, inconvenience, physical impairment, disfigurement, loss of function, impaired enjoyment of life, susceptibility to future harm or injury, and a shortened life expectancy, and she will continue to do so for the remainder of her life.

212.    As a result, it became necessary for Plaintiff to incur expenses from medical care and treatment and life care, and related costs and expenses required in the care and treatment of

said injuries. Plaintiff's damages in this respect are presently unascertained as said services are continuing.

213.    As a result, it will be necessary for Plaintiff to incur future medical care and treatment and life care and related costs and expenses required for reasonably necessary future care and treatment. Plaintiff's damages in this respect are presently unascertained as said services are continuing.

214.    As a result, Plaintiff's power to earn money has been reduced and thus she has and is incurring special damages for loss of earning capacity in a presently unascertained sum as said loss is continuing.

215.    Plaintiff hereby sues for all damages caused by Defendants' wrongful conduct, defective product, negligence, failure to warn, design defects and breaches of warranty, including without limitation past and future pain, suffering, mental anguish, inconvenience, physical impairment, medical and life care expenses, disfigurement, loss of function, impaired enjoyment of life, susceptibility to future harm or injury, shortened life expectancy, lost wages, and loss of earning capacity.

**Punitive Damages**

216.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of paraquat. Nonetheless, Defendants deliberatively crafted their label, marketing, and promotion to mislead farmers and consumers.

217.    This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry that paraquat did not cause neurological injuries and Parkinson's disease, and that full disclosure of the true risks of paraquat would limit the amount of money Defendants would make selling paraquat.

Defendants' objective was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff was denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

218.    Alternatively, Plaintiff alleges that Defendants engaged in such conduct with gross negligence and/or recklessness.

219.    There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiff requests punitive damages against the Defendants for the harms caused to Plaintiff.

**Paraquat regulation**

220.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the United States, requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

221.    Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

222.    FIFRA generally requires that the registrant conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product test that are required of the manufacturer.

223.    The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person . . . any pesticide which is . . . misbranded." 7 U.S.C. § 136j(a)(1)(E).

224.    A pesticide is misbranded under FIFRA if, among other things:

a.      its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients that is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

b.      the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under Section 136a(d) of the title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

c.      the label does not contain a warning or caution statement that may be necessary and if complied with, together with any requirements imposed under section 136a(d) of the title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(l)(G).

225.    Because it is unlawful to sell a pesticide that is registered but nevertheless misbranded, manufacturers have a continuing obligation to adhere to FIFRA's labeling requirements. 7 U.S.C. § 136j(a)(1)(E), § 136a(f)(2), § 136a(f)(1).

226.    Manufacturers are likewise obligated to report incidents involving a pesticide's toxic effects that may not be adequately reflected in its label's warnings. 40 C.F.R. 159.184(a), (b).

227.   Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA. Accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, that allegation is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA; however, Plaintiff brings claims and seek relief in this action only under state law, and does not bring any claims or seek any relief in this action under FIFRA.

## FACTUAL ALLEGATIONS COMMON TO SPECIFIC CLAIMS

### Strict product liability – design defect

228.   At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in California.

229.   Plaintiff Sandra McCarter was exposed to paraquat sold and used in California that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in California.

230.   The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which

Plaintiff Sandra McCarter was exposed was in a defective condition that made it unreasonably dangerous, in that when used in the intended and directed manner or a reasonably foreseeable manner:

        a.     it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

        b.     when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

231.    This defective condition existed in the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Sandra McCarter was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

232.    As a result of this defective condition, the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Sandra McCarter was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or

the magnitude of the dangers outweighed its utility.

233.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Sandra McCarter was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

### Strict product liability – failure to warn

234.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in California.

235.    Plaintiff Sandra McCarter was exposed to paraquat sold and used in California that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in California.

236.    When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the paraquat to which Plaintiff Sandra McCarter was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known that when used in the intended and directed manner or a reasonably foreseeable manner:

        a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.      when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause, potentiate, promote, or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

237.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Sandra McCarter was exposed was in a defective condition that made it unreasonably dangerous when it was used in the intended and directed manner or a reasonably foreseeable manner, in that:

a.      it was not accompanied by directions for use that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.      it did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect those exposed from the risk of neurological damage.

238.    This defective condition existed in the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Sandra McCarter was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert

and was placed into the stream of commerce.

239.    As a result of this defective condition, the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Sandra McCarter was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

240.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Sandra McCarter was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

## Negligence

241.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in California.

242.    Plaintiff Sandra McCarter was exposed to paraquat sold and used in California that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in California.

243.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Sandra McCarter was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

244.   At all times relevant to this claim, in designing, manufacturing, packaging, labeling, distributing, and selling paraquat, and in acting in concert with others who did so, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to it, including Plaintiff Sandra McCarter.

245.   When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, packaged, labeled, distributed, and sold the paraquat to which Plaintiff Sandra McCarter was exposed, it was reasonably foreseeable, and Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary case should have known, that when paraquat was used in the intended and directed manner or a reasonably foreseeable manner:

a.   it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.   when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause, potentiate, promote, or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

246.   In breach of the aforementioned duty to Plaintiff, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert negligently:

a.    failed to design, manufacture, formulate, and package paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

b.    designed, manufactured, and formulated paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

c.    failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d.    failed to perform adequate testing to determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.    failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used

it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

f.      failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

g.      failed to direct that paraquat be used in a manner that would have made it unlikely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

h.      it did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect those exposed from the risk of neurological damage.

## COUNT 1
## STRICT PRODUCT LIABILITY – DESIGN DEFECT

**AGAINST DEFENDANTS SCPLLC AND SAG**

247.    Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further allege:

248.    As a direct and proximate result of the defective and unreasonably dangerous condition of the paraquat manufactured, distributed, and sold by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff incurred and sues to recover damages including, without limitation Plaintiff Sandra McCarter's severe and permanent physical injuries, past and future pain, suffering, mental anguish, inconvenience, physical impairment, medical and life care expenses, disfigurement, loss of function, impaired enjoyment of life, susceptibility to future harm or injury, shortened life expectancy, lost wages, and loss of earning capacity.

249.    Defendants' intentional, reckless or grossly negligent disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

250.    Plaintiff therefore respectfully prays that this Court enter judgment in their favor and against Defendants Syngenta Crop Protection LLC and Syngenta AG, jointly and severally, in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

**COUNT 2**
**STRICT PRODUCT LIABILITY – FAILURE TO WARN**
**AGAINST DEFENDANTS SCPLLC AND SAG**

251.    Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further allege:

252.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the paraquat manufactured, distributed and sold by SCPLLC,

SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff incurred and sues to recover damages including, without limitation Plaintiff Sandra McCarter's severe and permanent physical injuries, past and future pain, suffering, mental anguish, inconvenience, physical impairment, medical and life care expenses, disfigurement, loss of function, impaired enjoyment of life, susceptibility to future harm or injury, shortened life expectancy, lost wages, and loss of earning capacity.

253.   Defendants' intentional, reckless or grossly negligent disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

254.   Plaintiff therefore respectfully prays that this Court enter judgment in their favor and against Defendants Syngenta Crop Protection LLC and Syngenta AG, jointly and severally, in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

## COUNT 3
## NEGLIGENCE
## AGAINST DEFENDANTS SCPLLC AND SAG

255.   Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further allege:

256.   As a direct and proximate result of the negligence of SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff incurred and sues to recover damages including, without limitation Plaintiff Sandra McCarter's severe and permanent physical injuries, past and future pain, suffering, mental anguish, inconvenience, physical impairment, medical and life care expenses, disfigurement, loss of function, impaired enjoyment of life, susceptibility to future harm or injury, shortened life expectancy, lost wages, and loss of earning capacity.

257.    Defendants' intentional disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

258.    Plaintiff therefore respectfully prays that this Court enter judgment in their favor and against Defendants Syngenta Crop Protection LLC and Syngenta AG, jointly and severally, in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

### COUNT 4
### STRICT PRODUCT LIABILITY – DESIGN DEFECT
### AGAINST DEFENDANT CHEVRON U.S.A.

259.    Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further allege:

260.    As a direct and proximate result of the defective and unreasonably dangerous condition of the paraquat manufactured, distributed and sold by CP Chemical and Chevron U.S.A., their corporate predecessors, and others with whom they acted in concert, Plaintiff incurred and sues to recover damages including, without limitation Plaintiff Sandra McCarter's severe and permanent physical injuries, past and future pain, suffering, mental anguish, inconvenience, physical impairment, medical and life care expenses, disfigurement, loss of function, impaired enjoyment of life, susceptibility to future harm or injury, shortened life expectancy, lost wages, and loss of earning capacity.

261.    Defendants' intentional, reckless or grossly negligent disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

262.    Plaintiff therefore respectfully prays that this Court enter judgment in their favor and against Defendant Chevron U.S.A. Inc. in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

**COUNT 5**
**STRICT PRODUCT LIABILITY – FAILURE TO WARN**
**AGAINST DEFENDANT CHEVRON U.S.A.**

263.     Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further allege:

264.     As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the paraquat manufactured, distributed and sold by CP Chemical and Chevron U.S.A., their corporate predecessors, and others with whom they acted in concert, Plaintiff incurred and sues to recover damages including, without limitation Plaintiff Sandra McCarter's severe and permanent physical injuries, past and future pain, suffering, mental anguish, inconvenience, physical impairment, medical and life care expenses, disfigurement, loss of function, impaired enjoyment of life, susceptibility to future harm or injury, shortened life expectancy, lost wages, and loss of earning capacity.

265.     Defendants' intentional, reckless or grossly negligent disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

266.     Plaintiff therefore respectfully prays that this Court enter judgment in their favor and against Defendant Chevron U.S.A. Inc. in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

**COUNT 6**
**NEGLIGENCE**
**AGAINST DEFENDANT CHEVRON U.S.A.**

267.     Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further allege:

268.     As a direct and proximate result of the negligence of CP Chemical and Chevron U.S.A., their corporate predecessors, and others with whom they acted in concert, Plaintiff

incurred and sues to recover damages including, without limitation Plaintiff Sandra McCarter's severe and permanent physical injuries, past and future pain, suffering, mental anguish, inconvenience, physical impairment, medical and life care expenses, disfigurement, loss of function, impaired enjoyment of life, susceptibility to future harm or injury, shortened life expectancy, lost wages, and loss of earning capacity.

269.    Defendants' intentional, reckless or grossly negligent disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

270.    Plaintiff therefore respectfully prays that this Court enter judgment in their favor and against Defendant Chevron U.S.A. Inc. in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests this Court to enter judgment in Plaintiff's favor and against the Defendants for:

a.    actual or compensatory damages in such amount to be determined at trial and as  provided by applicable law;

b.    exemplary and punitive damages sufficient to punish and deter the Defendants and others from future misconduct;

c.    pre-judgment and post-judgment interest;

d.    costs, including reasonable attorneys' fees, court costs, and other litigation  expenses; and

e.    any other relief the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all of the triable issues within this pleading.

Dated: July 17, 2024,                             Respectfully submitted,

                                                  **Kirkendall Dwyer**
                                                  */s/ Andrew Kirkendall*
                                                  Andrew Kirkendall
                                                  TX SBN 24050882
                                                  akirkendall@kirkendalldwyer.com
                                                  4343 Sigma Rd Ste 200
                                                  Dallas, TX 75244
                                                  214-271-4027 Telephone
                                                  214-253-0629 Facsimile
                                                  *Attorneys for Plaintiff*